UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DRITA MOSCHETTI,

                        Plaintiff,

        -v-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                        Defendant.

No. 15-CV-3161 (KMK)

<u>OPINION &  ORDER</u>

Appearances:

Michael H. Sussman, Esq.
Sussman & Associates
*Counsel for Plaintiff*

Cassandra Natasha Branch, Esq.
New York City Law Department, Office of the Corporation Counsel
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Drita Moschetti ("Plaintiff") brings this Action against the New York City

Department of Education ("DOE" or "Defendant") alleging discrimination based on her national

origin and disability, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000(e), *et seq.* ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C.

§ 12101 ("ADA").  (Compl. (Dkt. No. 1).)  Plaintiff identifies as an individual of Serbian and

Albanian descent, and alleges she has a limited mobility disability of difficulty walking due to

injuries to her back, leg, and neck caused by a fall.  (*See generally* Compl.)  Before the Court is

Defendants' Motion for Summary Judgment.  (Notice of Mot. For Summ. J. (Dkt. No. 41).)  For

the following reasons, the Motion is granted.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 43)), Plaintiff's response to Defendant's 56.1 statement and counterstatement, (Pl.'s Resp. to Def.'s 56.1 Statement & Counterstatement ("Pl.'s Resp. 56.1" and "Pl.'s Counter 56.1," respectively) (Dkt. No. 44)), and the exhibits submitted by both Parties, (Decl. of Cassandra Branch, Esq. in Supp. of Mot. for Summ. J. ("Branch Decl.") (Dkt. No. 42); Aff'n of Michael H. Sussman in Opp'n to Mot. for Summ. J. ("Sussman Aff'n") (Dkt. No. 45); Aff. of Josh Moschetti in Opp'n to Mot. for Summ. J. ("John Aff.") (Dkt. No. 46); Aff. of Drita Moschetti in Opp'n to Mot. for Summ. J. ("Pl.'s Aff.") (Dkt. No. 47)), and are recounted in the light most favorable to Plaintiff, the non-movant. The facts as described below are not in dispute unless indicated otherwise.

<u>1.  Plaintiff's Employment at Jonathan Levin High School for Media and Communications, 2011–13</u>

Plaintiff began her employment with DOE in September 1998 as a Special Education Teacher.  (Def.'s 56.1 ¶ 10.)  For the 2011–12 and 2012–13 school years, Plaintiff was assigned to Jonathan Levin High School for Media and Communications ("JLHS"), located in Bronx, New York.  (*Id.* ¶ 11.)  As a Special Education teacher, Plaintiff's job duties included, among other things: organizing student curriculum, using DOE approved methods for teaching lessons, and administering and grading tests.  (*Id.* ¶ 13.)  Nasib Hoxha was the Principal at JLHS during Plaintiff's time there.  (*Id.* ¶ 13.)  Jacqueline Kapaj Vieira ("Vieira"), who is of Albanian descent, was an Assistant Principal at JLHS, and was one of Plaintiff's supervisors.  (*Id.* ¶ 14.)

Shortly after Plaintiff started at JLHS, Hoxha informed Vieira that there was another Albanian on the staff.  (Pl.'s Counter 56.1 6 ¶ 2.)  According to Vieira, Plaintiff told her that

Plaintiff's mother was Albanian.  (*Id.* ¶ 6.)  However, Plaintiff avers her mother is Serbian and

that is what she told Vieira.  (*Id.*)  Plaintiff also contends that after hearing her mother was

Serbian, Vieira told Plaintiff to keep that fact quiet.  (*Id.*)[1]

In her capacity as supervisor, Vieira observed Plaintiff teaching a class on December 19,

2012, following a pre-observation conference with Plaintiff on December 18, 2012 to discuss her

lesson plan to be observed and teaching goals.  (Def.'s 56.1. ¶ 15.)  On December 21, 2012,

Vieira and Plaintiff met for a post-observation conference.  (*Id.* ¶ 16.)  On that same date, Vieira

issued Plaintiff an Observation Report.  (*Id.* ¶ 17.)  The report commended Plaintiff for engaging

all of her students and employing "differentiation," or multi-approached, student-centered

instruction techniques, throughout the lesson, (*id.* ¶ 17); provided recommendations for Plaintiff

to better manage disruptive student behavior by posting and enforcing classroom behavior

guidelines and assigning classroom monitors, (*id.*¶ 18); and recommended that Plaintiff end her

lessons by summarizing what was learned and implement a rubric to use for evaluating student

presentations, (*id.*).  Overall, Vieira rated Plaintiff's December 19, 2012 lesson "Satisfactory."

(*Id.* ¶ 19.)

---

[1] The Court notes here, and in other instances where Plaintiff disputes facts in
Defendant's 56.1, Plaintiff's 56.1 statement fails to cite the supporting portions of the record.
(*E.g.*, Pl.'s Resp. 56.1 ¶¶ 97, 108, 111, 141; Pl.'s Counter 56.1 ¶ 6.)  The Court may deem such
challenged facts undisputed and need not consider the unsupported facts in the counter
statements.  L. Civ. R. 56.1(d) ("Each statement by the . . . opponent . . . . must be followed by
citation to evidence which would be admissible."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73
(2d Cir. 2001) (explaining that a court is not required to search the record for genuine issues of
material fact that the party opposing summary judgment failed to bring to the court's attention in
the 56.1 statement); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases
holding that "responses that do not point to any evidence in the record that may create a genuine
issue of material fact do not function as denials, and will be deemed admissions of the stated
fact."  (alteration and internal quotation marks omitted)).

Plaintiff testified that sometime in February 2013 she heard Vieira call her a "crazy Serb" in Albanian during a telephone conversation with an unknown person. (Def.'s 56.1 ¶ 28 (citing Pl.'s Dep. 77–78 (testifying Vieira "called [Plaintiff] to her office . . . and [Vieira] was on the phone, and [Plaintiff] heard her say that over the phone").) However, in her Affidavit in opposition to the Motion, Plaintiff said that in late 2012, Vieira told Plaintiff she did not like Serbs, and several weeks later, referred to Plaintiff as a "crazy Serb." (Pl.'s Counter 56.1 ¶¶ 1–2; Pl.'s Aff. ¶ 2.)[2] Vieira denies even knowing Plaintiff was Serbian or making any derogatory comments about Serbians to Plaintiff. (Pl.'s Counter 56.1 ¶ 8; Sussman Decl. Ex. B ("Vieira Dep.") 30 (Dkt. No. 45).) Plaintiff also testified that Vieira tried to "antagonize" her by bringing up a lawsuit that Plaintiff's husband brought in 1995 against the City of Yonkers concerning Vieira's former supervisor, Evelyn Tangredi. (Def.'s 56.1 ¶ 29.)

Following a pre-observation conference on April 9, 2013, Vieira observed Plaintiff on April 11, 2013 teaching a science lesson. (*Id.* ¶ 20.) Vieira issued Plaintiff an Observation Report, dated April 22, 2013, noting the following deficiencies: Plaintiff had not followed the lesson plan that she submitted in her pre-observation conference; the lesson did not address the stated student objectives; Plaintiff returned quizzes to students that had not been graded and did not review the quizzes; Plaintiff did not address the aim stated in her submitted lesson plan; Plaintiff failed to implement guidelines to manage student behavior, as advised in her December 19, 2012 Observation Report; Plaintiff did not display work from the current students; and

---

[2] To the extent this new statement in Plaintiff's affidavit that Vieira told Plaintiff to her face that she was a "crazy Serb," (Pl.'s Aff. ¶ 2), contradicts her earlier deposition testimony that Plaintiff overheard Vieira say it on the phone to someone else, (Pl.'s Dep. 77–78), the Court will disregard it. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the Plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").

Plaintiff did not recap the lesson or review what had already been learned that week. (*Id.* ¶ 21.) In the April 11, 2013 Observation Report, Vieira gave Plaintiff recommendations on how to address each of these deficiencies, and provided Plaintiff with the school's instruction model for lesson writing, and directed Plaintiff to submit copies of her lesson plans every Monday to ensure compliance. (*Id.* ¶ 22.) Overall, Vieira rated Plaintiff's April 11, 2013 lesson "Unsatisfactory." (*Id.* ¶ 23.) Plaintiff refused to sign Vieira's April 11, 2013 Observation Report. (*Id.* ¶ 24.) The Parties dispute whether Plaintiff submitted a written rebuttal to the Observation Report. (*Id.* ¶ 25; Pl.'s Resp. 56.1 ¶ 25.)[3] After issuing Plaintiff's unsatisfactory April 11, 2013 Observation Report, Vieira recommended professional development courses for Plaintiff and reviewed her lesson plan submissions. (Def.'s 56.1 ¶ 26.) Plaintiff received a "Satisfactory" Annual Professional Performance Review ("APPR") for the 2011–12 school year. (*Id.* ¶ 27.)

Towards the end of the 2012–13 school year, Plaintiff learned that DOE planned to downsize the staff at JLHS and eventually close the school. (*Id.* ¶ 30.) Plaintiff believed that she would be excessed from JLHS and would have to seek employment for the upcoming school year through DOE's online Open Market for teachers. (*Id.* ¶ 31.)[4] After Plaintiff learned that she was scheduled to return JLHS for the 2013–14, Plaintiff intended to search for another

---

[3] Plaintiff's affidavit states that on April 13, 2013 she submitted a rebuttal to the April 2013 Observation Report. (Moschetti Aff. ¶ 5.) Plaintiff includes an exhibit—a typed letter dated April 13, 2013, which contains no indication it was ever submitted. (Moschetti Aff. Ex. 1.)

[4] Teachers are excessed when registration is lower than previous years and less teachers are needed. (Sussman Dec. Ex. 5 ("Barba Dep.") 56 (Dkt. No. 45).) Who is excessed is based on seniority within DOE. (*Id.*) Plaintiff alleges that she not only "believed" she would be excessed but actually had been excessed from JLHS in June. (Pl.'s Resp. 56.1 ¶ 31 (citing Branch Decl. Ex L).) However, the following month, she was then directed to return to that school for the 2013–14 school year. (*Id.*)

teaching position, because she did not want to return to JHLS.  (*Id.* ¶ 32.)  Plaintiff had

previously worked in three closing schools, and preferred to work at a more stable assignment.

(Pl.'s 56.1 ¶ 32.)  Plaintiff applied on DOE's Open Market for a transfer to the Bronx High

School of Business ("BHSB'), in Bronx, New York for the 2013–14 school year.  (Def.'s 56.1

¶ 32.)

### 2.  Plaintiff's Employment at Bronx High School of Business, 2013–2014

Plaintiff interviewed with the BHSB Principal, Vincent Rodriguez ("Rodriguez"), and

was hired as a Special Education teacher at BHSB on August 7, 2013.  (*Id.* ¶ 35.)  BHSB was

"co-located" with, or located in the same building as, Plaintiff's former school, JLHS.  (*Id.* ¶ 36.)

### a.  Plaintiff's October 7, 2013 Observation

At the beginning of the 2013–14 school year, BHSB, like all DOE schools, was required

to adopt DOE's new teacher evaluation system, known as "Advance."  (*Id.* at 37.)  Under the

system, teachers choose between two observation options for the school year:  Option 1 includes

a minimum of four observations during the school year, including one formal observation and

three informal observations.  Option 2 includes a minimum of six informal, unannounced

observations, each lasting at least fifteen minutes, and no formal observation.  (*Id.* at 39.)[5]

Teachers are scored in accordance with the "Danielson" framework—a teaching framework

named in honor of its creator—which measures up to twenty-two teaching components, each on

---

[5] The Parties dispute which option Plaintiff chose.  (Def.'s 56.1 ¶ 44; Pl.'s Resp. 56.1 ¶ 44.)  The Court is unsure how this fact is material, as it is undisputed Plaintiff received three informal observations only during the 2013–2014 school year, and thus neither option was completed.  (*See* Branch Decl. Ex. Q ("Oct. 7, 2014 Observation"); Branch Decl. Ex. R ("Dec. 12, 2013 Observation"); Branch Decl. Ex. S ("Apr. 7, 2014 Observation").)

a four-point scale.  (*Id.* at 37.)[6]  Under the 2013 framework, evaluators were required to provide

teachers with a copy of their lesson observations within ninety days of the observation.  (*Id.*

¶ 40.)  Teachers were also required to participate in two face-to-face conferences each year, an

"initial planning conference," and an "end-of-year conference."  (Pl.'s Counter 56.1 ¶ 15.)  The

BHSB Faculty Handbook specified that BHSB "has been identified by the New York City

Department of Education as a Persistently Low Achieving (PLA) school for several years."

(Def.'s 56.1 ¶ 42 (quoting Branch Decl. Ex. P ("BHSB 2013–14 Faculty Handbook") 10–12.)

"Because of this, the BHSB was slated to become a Restart School, and that as part of the restart,

teacher observations would focus on seven specific Danielson competencies, subject to change

by DOE."  (*Id.* ¶ 43 (quoting BHSB 2013–14 Faculty Handbook 24.)

   BHSB Assistant Principal Michael Barba ("Barba") performed an informal observation

of Plaintiff's class on October 7, 2013.  (*Id.* ¶ 45.)  According to Plaintiff, she had not had an

initial planning conference prior to the first observation.  (Pl.'s Counter 56.1 ¶ 30.)  Barba's

written observation of the October 7, 2013 lesson rated Plaintiff as "Effective" in two categories,

"Developing" in three categories, and "Ineffective" in one category.  (Def.'s 56.1 ¶ 43.)  Barba

did not rate Plaintiff in the other categories.  (Pl.'s Resp. 56.1 ¶ 46.)  Specifically, Barba noted in

the observation that Plaintiff appeared to be "going through the motions" of a lesson, and that

---

[6] The Parties dispute whether observers were required to rate teachers in every Danielson component.  (Def.'s 56.1 ¶ 38; Pl.'s Resp. 56.1 ¶ 38 (citing Branch Decl. Ex. N ("DOE's Introduction to Advance") 24; Oct. 7, 2014 Observation)).)  As evidence it was required, Plaintiff cites to DOE's "Introduction to Advance "materials, however; the page number cited makes no reference as to whether all the elements must be evaluated.  (DOE's Introduction to Advance 24.)  Moreover, the evaluation form Plaintiff cites clearly states, "if there is no evidence for a component, N/A (Not Applicable) should be entered."  (Oct. 7, 2014 Observation.)  However, John Moschetti "believed" that N/A was only to be used sparingly.  (Pl.'s Counter 56.1 ¶ 27.)  Based on the evidence in the record cited by Plaintiff—which actually supports Defendant's position—the Court concludes it was not required.

"[t]he lab activity [Plaintiff] used is not part of the 9th grade living environment curriculum."

(Def.'s 56.1. ¶ 47.)  Barba also observed that students "were only required to take their pulse and

record it at various intervals.  They were not asked to do anything more cognitively challenging,"

and did not "engage in self-or peer assessment."  (*Id.*)  Barba's written observation noted that he

met with Plaintiff for a post-observation conference on October 10, 2013.  (*Id.* ¶ 48.)  The

section entitled "Additional Evaluator Notes" explained that during the post-observation

conference, Barba and Plaintiff "discussed low inference notes and aligned them to the

Danielson rubric," agreed that Plaintiff "would follow the 9th grade calendar," and "discussed

the importance of using more rigorous activities and assessments in [Plaintiff's] lessons."  (*Id.*)

The section concluded "[c]lassroom observations will be used to monitor the implementation of

these next steps."  (*Id.*)  On January 24, 2014, Barba emailed Plaintiff, stating that he had placed

two copies of Plaintiff's observation in her school mailbox, and requested that Plaintiff sign and

return one copy.  (*Id.* ¶ 49; Pl.'s Resp. 56.1 ¶ 49.)  Plaintiff refused to sign the October 7, 2013

Evaluation or provide a written rebuttal.  (Def.'s 56.1 ¶¶ 50–51.)  After the post-observation

conference, Plaintiff spoke with Rodriguez and asked him to observe her without Barba.  (Pl.'s

Resp. 56.1 ¶ 51.)

### b.  Vieira's Temporary Assignment a BHSB

In November 2013, Vieira was temporarily assigned to BHSB for approximately one

month.  (Def.'s 56.1 ¶ 52.)  During her time at BHSB, Vieira did not evaluate Plaintiff's

teaching.  (*Id.* ¶ 53.)  However, Plaintiff testified she saw Vieira spending "a lot of time" around

Barba's office in November of 2013, and that afterwards, Rodriguez and Barba were "cruel" and

treated her unfairly.  (*Id.* ¶ 102.)  According to Plaintiff, Vieira knew Barba because the two had

worked in the same building for seven or eight years.  (Pl.'s Counter 56.1 ¶ 44.)  However, Barba

contended he only "knew of" Vieira.  (*Id.* ¶ 46.)  Vieira testified that she worked with Barba on a report for two to three days during the month she was assigned to BHSB, (*id.* ¶¶ 47, 53), but Barba testified that he did not "come to know" Vieira during that time, (*id.* ¶ 48), and did not recall meeting with Vieira in his office, (*id.* ¶ 49), or working together on a report, (*id.* ¶¶ 51–52).  Vieira testified that she never spoke with Barba about Plaintiff.  (Vieira Dep. 24.)  Additionally, Plaintiff alleges Vieira knew Rodriguez, as they had attended a year-long education leadership program together.  (Pl.'s Counter 56.1 ¶ 40.)

Plaintiff was worried about Vieira and Barba interacting, (*id.* ¶ 58), because she had informed Rodriguez about her issues with Vieira prior to starting at BHSB, including the anti-Serbian comments and the "Unsatisfactory" Observation she received, and she was worried Vieira might poison the waters at BHSB.  (*Id.* ¶ 59.)  However, Plaintiff testified that while she was at BHSB, she never heard Vieira talking to either Rodriguez or Barba about her and never heard Vieira talk to Rodriguez or Barba about her Serbian background.  (Def.'s 56.1 ¶ 103.)  Plaintiff also testified that Rodriguez and Barba never mentioned their relationship with Vieira to Plaintiff at any point, never referred to Plaintiff's national origin, and never indicated that they knew of Plaintiff's husband's previous lawsuit.  (*Id.* ¶ 104.)

### c.  Plaintiff's December 12, 2013 Evaluation

Barba performed another informal observation of Plaintiff's class on December 12, 2013, and rated Plaintiff's lesson as "Ineffective" in five categories.  (*Id.* ¶ 54.)  Barba did not rate Plaintiff in the other categories.  (Pl.'s Resp. 56.1 ¶ 46.)  Barba noted that, again, Plaintiff's lesson included low-level questions, did not intellectually challenge students, and involved little to no assessment of student learning.  (Def.'s 56.1 ¶ 55.)  Barba further observed that Plaintiff's executed lesson did not match her pre-submitted lesson plan.  (*Id.*)  Barba issued Plaintiff eleven

recommendations regarding how to make her lessons more productive, including: organizing board notes, structuring her lesson, and asking students questions that required critical thinking. (*Id.*)  Again, Barba and Plaintiff met for a post-observation conference.  (*Id.* ¶ 56.)  The section entitled "Additional Evaluator Notes" explained that during the post-observation conference Barba and Plaintiff "discussed some concerns about the lesson, all related to poor planning." (*Id.*)  Plaintiff refused to sign Barba's evaluation of her December 12, 2013 lesson.  (*Id.* ¶ 57.)

Plaintiff concluded that Barba had made false and negative claims about her teaching. (Pl.'s Counter 56.1 ¶ 61.)  Accordingly, on December 20, 2013, Plaintiff went to see Rodriguez and explained her concerns about Barba being influenced by Vieira, and told Rodriguez that she had seen them conferring extensively.  (*Id.* ¶ 62.)  At this meeting, Rodriguez told her that he did not care for Barba and downplayed the import of Barba's input.  (*Id.* ¶ 63.)  Rodriguez also encouraged Plaintiff to utilize DOE's Office of Equal Opportunity ("OEO") and file a complaint relating to what she believed was Vieira's bias affecting Barba's unfair observations.  (*Id.*)

### d.  January 2, 2014 OEO Complaint

On January 2, 2014, Plaintiff filed a complaint with OEO.  (Def.'s 56.1 ¶ 58.)[7]  Plaintiff's complaint alleged, in part, that: Vieira made an "ethnic slur" regarding Plaintiff and issued Plaintiff a "skewed" observation for the December 19, 2012 lesson in retaliation for a lawsuit brought by Plaintiff's husband; Barba "treated [Plaintiff] disrespectfully because of [Plaintiff's] gender and age" during her October 10, 2013 post-observation conference; and Barba and BHSB Assistant Principal Faye Brown ("Brown") treated Plaintiff unfairly during her December 12, 2013 lesson observation and December 16, 2013 post-observation conference.  (*Id.* ¶ 59.)

---

[7] According to Plaintiff, as of January 1, 2014 she had not received the write-ups for either the October 7, 2012 or December 19, 2012 observation.  (Pl.'s Resp. 56.1 ¶ 57.)

Plaintiff believed Barba misused the Advance evaluation instrument by failing to rate her on many observable Danielson domains.  (Pl.'s Counter 56.1 ¶ 65.)  Plaintiff's OEO complaint did not allege that Barba discriminated against her on the basis of her national origin or retaliated against her due to Vieira's influence.  (Def.'s 56.1 ¶ 60.)  However, Plaintiff alleges that the complaint did indicate that Vieira was unfair to her after learning of her national origin and references Vieira's presence at BHSB and expresses concern as to her influencing Barba.  (Pl.'s Resp. 56.1 ¶ 60.)

After receiving Plaintiff's complaint, the OEO attempted to meet with Plaintiff for an interview.  (Def.'s 56.1 ¶ 61.)  According to Defendant, Plaintiff arrived late to her first appointment, resulting in its cancellation; failed to properly reschedule the appointment; and never responded to OEO's proposals to reschedule.  (*Id.*)  Plaintiff counters that she twice went to the OEO office for meetings and on both occasions, OEO staff would not see her.  (Pl.'s 56.1 Resp. ¶ 61.)  Plaintiff did not respond to OEO's final written request for Plaintiff to contact their office by September 12, 2014 regarding her January 1, 2014 complaint.  (Def.'s 56.1 ¶ 62.)  Accordingly, the OEO administratively closed Plaintiff's case on September 22, 2014.  (*Id.*)

### e.  Plaintiff's Accident and February 25, 2014 Sick Leave Application

On January 6, 2014, Plaintiff slipped on a wet floor while working at BHSB.  (*Id.* ¶ 63.)  Plaintiff alleges that following her slip and fall, Rodriguez approached her and asked her if she fell intentionally.  (Pl.'s Counter 56.1 ¶ 66.)  Rodriguez denies ever asking such a question.  (Sussman Decl. Ex. E ("Rodriguez Dep.") 68–69 (Dkt. No. 45).)

To obtain an excused leave of absence with pay and without loss of sick leave due to a line of duty injury ("LODI"), regularly appointed instructional staff must submit an Application for Excuse of Absence for Personal Illness ("Sick Leave Application"), a "Report of Injury to

Member of Professional Staff" form, a "Comprehensive Injury Report" ("CIR") and Assignment

form, and for extended leaves, a "Confidential Medical Report" signed by a physician. (*Id.*

¶ 64.) A principal may approve sick leaves less than twenty days. (Def.'s 56.1 ¶ 65.)

Applications for longer sick leaves and any LODI leave require DOE Medical Division approval.

(*Id.*) All pedagogical employees must use DOE's Self-Service Online Leave Application System

("SOLAS") to apply for any type of leave. (*Id.* ¶ 66.)

Plaintiff submitted a Sick Leave Application and supporting documents on February 25,

2014 to excuse her absence from January 7 to January 10, 2014 due to her fall as a LODI. (*Id.*

¶ 67.) DOE's Medical Leaves and Records Administration issued Plaintiff a letter, dated March

24, 2014, informing Plaintiff that her request for absence due to LODI from January 7 to January

10, 2014 was approved, and that approved days would not be taken out of Plaintiff's leave bank,

referred to as the Cumulative Absence Reserve ("CAR"). (*Id.* ¶ 68.)

<u>f. Plaintiff's April 7, 2014 Observation</u>

Rodriguez performed an informal observation of Plaintiff on April 7, 2014. (*Id.* ¶ 69.)

Plaintiff was administering a quiz that day. (Pl.'s Resp. 56.1 ¶ 69.) Rodriguez rated Plaintiff's

lesson as "Effective" in one category, "Developing" in two categories, and "Ineffective" in one

category. (Def.'s 56.1 ¶ 70.) Rodriguez did not rate Plaintiff in the other categories. (Pl.'s 56.1

¶ 70.) Rodriguez noted that the lesson task of copying PowerPoint presentation notes required

little to no student investment, that Plaintiff failed to communicate the lesson, and that the lesson

was not rigorous. (Def.'s 56.1 ¶ 70.) Rodriguez and Plaintiff met for a post-observation

conference on April 10, 2014. (*Id.* ¶ 71.) In the section of entitled "Additional Evaluator Notes"

Rodriguez wrote that Plaintiff's assigned classwork "was not considered rigor," [sic] and

reminded Plaintiff that she must "reflect on the school's Instructional Focus for the school year,

'Evidence in Argument.'" (*Id.*) Rodriguez asked Plaintiff to view and reflect on a video entitled "An Introduction for Establishing a Culture for Learning," and reminded Plaintiff that she "must establish high expectations of student behavior and work." (*Id.*) Plaintiff refused to sign Rodriguez's evaluation of her April 7, 2014 lesson. (*Id.* ¶ 72.) Plaintiff did not submit a written rebuttal to Rodriguez's observation of her April 7, 2014 lesson for her DOE file. (*Id.* ¶ 73.) However, Plaintiff contends the evaluation Rodriguez wrote was false and failed to evaluate Plaintiff along the vast majority of Danielson rubrics. (Pl.'s Counter 56.1 ¶ 69.)

On May 1, 2014, Rodriguez sent Plaintiff an email informing her that he still had not received Plaintiff's signed April 7, 2014 observation, and that he had placed another copy in Plaintiff's school mailbox to be returned by May 2, 2014. (Def.'s 56.1 ¶ 74.) On May 6, 2014, Plaintiff attended a pre-observation conference with Rodriguez and Barba concerning her formal observation scheduled to take place on May 13, 2014. (*Id.* ¶ 79.)

On May 1, 2014, Rodriguez also requested that Plaintiff meet with him for a pre-observation conference on May 6, 2014 to discuss Plaintiff's upcoming formal evaluation. (*Id.* ¶ 75.) On May 5, 2014, Rodriguez sent Plaintiff a letter scheduling her for a separate professional conference with him on May 8, 2014. (*Id.* ¶ 76.) The letter stated that the purpose of that conference was to discuss why Plaintiff had not submitted her signed observations as Rodriguez had requested in his May 1, 2014 email. (*Id.*) Plaintiff appeared in Rodriguez's office on May 5, 2014 to tell him that she had not submitted signed a copy of the April 7, 2014 observation because she sent it to her union and had not received a reply. (*Id.* ¶ 77.) Rodriguez told Plaintiff that he was "not prepared to address th[e] matter at that time, and to please wait for the scheduled date of May 8, 2014 to discuss." (*Id.* ¶ 78.)

Both Rodriguez and Barba attended Plaintiff's Professional Conference on May 8, 2014. (*Id.* ¶ 80.)  During the Professional Conference, Rodriguez informed Plaintiff that he would not discuss Plaintiff's rationale as to why she sent her observations to her union.  (*Id.* ¶ 81.) Rodriguez re-presented Plaintiff with the three unsigned observations for her October 7, 2012, December 12, 2013, and April 7, 2014 lessons, and Plaintiff did not sign them.  (*Id.*)  Plaintiff argues the stated purpose of this meeting was to provide her the chance to explain why she had not signed the prior informal observations; however, Rodriguez did not permit Plaintiff to explain the situation.  (Pl.'s Resp. 56.1 ¶ 81.)  She wrote him on May 10, 2014, that "[she] was hopeful at this meeting we would address all aspects of these evaluations and their effect on my rating since I have not received support from Mr. Barba.  As you know, Mr. Barba has not spoken with me since December."  (*Id.*)  According to Plaintiff, she was unable to sign her name at this meeting because of an injury to her thumb.  (*Id.*)  Rodriguez issued Plaintiff a letter memorializing the May 8, 2014 Professional Conference, and attached copies of Plaintiff's October 7, 2012, December 12, 2013, and April 7, 2014 lesson observations signed by Rodriguez and Barba on May 8, 2014.  (Def.'s 56.1 ¶ 82.)  All three observations were marked "Refused to Sign" where Plaintiff's signature was required, and dated May 8, 2014.  (*Id.*)

Plaintiff did not come to school on May 13, 2014, the date of her scheduled formal evaluation, because her vehicle was vandalized.  (*Id.* ¶ 83.)  Rodriguez emailed Plaintiff on May 19, 2014, noting that Plaintiff had missed her scheduled observation on May 13, 2014, and was absent on May 14, 15, 16, and 19, 2014.  (*Id.* ¶ 84.)  The email stated that Plaintiff would be formally observed based on her May 6, 2014 pre-observation conference on the first day that she returned to work.  (*Id.* ¶ 85.)  Rodriguez's email advised Plaintiff that failure to perform the required observations could adversely affect Plaintiff's Advance rating.  (*Id.*)

<u>g.  Plaintiff's Absence and June 4, 2014 Sick Leave Application</u>

Plaintiff began calling out of work regularly beginning on May 14, 2014, without giving Rodriguez an explanation for her absences.  (*Id.* ¶ 86.)  According to Plaintiff, in mid-2014, Plaintiff developed severe pain in her back, radiating down her left leg.  (Pl.'s Counter 56.1 ¶ 70.)  Plaintiff contends she "repeatedly contacted her employer, explaining her inability to come to work.  (*Id.* ¶ 71.)  On May 22, 2014, Rodriguez emailed Plaintiff again to advise Plaintiff that he was concerned about her twenty-eight total absences for the school year, intended to observe Plaintiff formally upon her return to work, and that Plaintiff's continued absence could affect the required observations needed for the school year, her rating in Advance and her end-of-year rating.  (Def.'s 56.1 ¶ 87.)  On June 3, 2014, Rodriguez emailed Plaintiff again, noting that she still had not returned to school, had approximately forty total absent days for the school year, and that Rodriguez still had not heard from Plaintiff.  (*Id.* ¶ 88.)  Rodriguez's email further noted that it was unacceptable for Plaintiff to call and simply state that she was not coining in without giving any reason.  (*Id.* ¶ 89.)  Rodriguez requested a response in writing from Plaintiff as to her anticipated return to work, and told Plaintiff that she would be scheduled for a Professional Conference concerning her absences upon her return.  (*Id.*)

On June 4, 2014, Plaintiff submitted an application on SOLAS for an extended LODI leave of absence covering the period from May 14, 2014 to June 3, 2014.  (*Id.* ¶ 90.)  Plaintiff's application said she was seeking a paid excused leave of absence for a LODI, but Defendant argues the application did not specify that Plaintiff was seeking the leave specifically based on her January 6, 2014 LODI.  (*Id.* ¶ 91 (Branch Decl. Ex. CC ("May to June 2014 Leave Application")).)  Plaintiff's application states she had lumbar and cervical issues that commenced on January 6, 2014, but did not specifically mention the fall at BHSB.  (May to June

2014 Leave Application.)[8]  On June 4, 2014, Rodriguez received an automatic email from the

SOLAS system stating that Plaintiff had submitted an application for LODI leave, requesting

leave from May 14 to June 20, 2014.  (Def.'s 56.1 ¶ 92.)  On June 9, 2014, Rodriguez denied

Plaintiff's request, and told his Payroll Secretary on June 9, 2014 and DOE's Human Resources

Division on June 19, 2014 that he did so because Plaintiff's documentation only showed that she

was seen by a physician on June 3, 2014, but the application did not explain why she had been

absent since May 14, 2014.  (*Id.* ¶ 94.)

On June 19, 2012, Plaintiff filed a grievance against Rodriguez for his failure to approve

her LODI leave.  (Pl.'s Counter 56.1 ¶ 85.)  Plaintiff also submitted a supplemental Sick Leave

Application, dated June 19, 2014, seeking to extend her already-denied leave request from June

23 to June 27, 2014.  (Def.'s 56.1. ¶ 95.)  On the supplemental Sick Leave Application, Plaintiff

checked the box marked "I wish to borrow sick days to be repaid or constitute a debt to [DOE]."

(*Id.* ¶¶ 95, 105.)[9]

On June 25, 2014, Plaintiff emailed Rodriguez stating that she was "at DOE awaiting an

exam."  (*Id.* ¶ 96.)  Plaintiff's email requested that her pay stubs be sent to her residence.  (*Id.*)

Rodriguez replied to Plaintiff's email that same day, noting that Plaintiff had called out sick on

June 23, 2014, and was unprofessional when she called on June 24, 2014 without providing an

explanation.  (*Id.* ¶ 97.)  Rodriguez also asked Plaintiff to clarify what she meant by "awaiting an

---

[8] Plaintiff claims the application made clear that due to the effects of the fall she
sustained on January 6, 2014, Plaintiff was experiencing symptoms and was seeking a leave of
absence due to a LODI, and cites to Exhibit "CCC."  (Pl.'s Counter 56.1 ¶ 91.)  Such an exhibit
does not exist.  (*See* Branch Decl. 1–6 (listing Exhibits A–ZZ).)  Assuming Plaintiff is referring
to Exhibit CC, the application, as noted, only mentions her injury commenced on January 6,
2014, but provides no further details.  (May to June 2014 Leave Application.)

[9] Plaintiff also specifically requested in her June 12, 2014 email to borrow "as many as
possible" so that she could continue to be paid.  (*Id.* ¶ 105.)

exam," and requested an explanation for her absence from May 14 to June 2, 2014, and the rationale for Plaintiff's presumed absence on June 26, 2014. (*Id.* ¶ 98.)

DOE's Medical, Leaves and Records Administration issued Plaintiff two letters, dated July 11, and August 6, 2014, advising Plaintiff that it denied her June 4, 2014 Sick Leave Application because some of the required information was missing, specifically: "OP 198 missing Principal's signature," "Employee written statement," and "Completed Comprehensive Injury Report." (*Id.* ¶ 106.)[10] On October 21, 2014, DOE's Medical, Leaves and Records Administration told Plaintiff that it required additional medical documentation to make a determination on Plaintiff's LODI Sick Leave Application. (*Id.* ¶ 107.) Plaintiff ultimately sought and received assistance from her union to resubmit her LODI leave request for May to June of 2014. (*Id.* ¶ 108 (citing Branch Decl. Ex. II ("Union LODI Resubmission Emails")).)[11]

The initial denial of Plaintiff's LODI leave request, multiple delays in obtaining and submitting proper medical documentation from Plaintiff, and paying Plaintiff with borrowed sick leave days ultimately resulted in deductions from Plaintiff's CAR balance and paychecks on September 15, September 30, and October 15, 2014. (*Id.* ¶ 109.)[12] Plaintiff filed a grievance

_____

[10] Plaintiff contends that she submitted all of the paperwork required on July 4, 2014. (Pl.'s Resp. 56.1 ¶ 106.) However, the LODI Application receipt she cites to in the record only indicates she submitted an application, not that it was complete. (*See* Moschetti Aff. Ex. 7 (Dkt. No. 47).)

[11] Plaintiff argues Exhibit II is inadmissible hearsay and does not demonstrate anything pertinent other than that Plaintiff had filed her complete application for LODI as she contended and that someone identified as Thomas Bennett found her required paperwork in SOLAS. (Pl.'s Resp. 56.1 ¶ 108.) However, Plaintiff herself admits she sought union assistance in resolving her LODI leave issues, so the Court need not consider Exhibit II specifically to support that fact. (Pl.'s Counter 56.1 ¶ 85.)

[12] Oddly, Defendant contends that "DOE payroll records and Plaintiff's bank statements . . . reflect that she was properly paid her regular salary during that time period" while also admitting that Plaintiff had to be paid back payroll that was improperly deducted. (Def.'s 56.1

through her union on October 1, 2014, (Pl.'s Counter 56.1 ¶ 111), and the payroll deductions that occurred between September and October 2014 were fully paid back to Plaintiff in her October 31, 2014 paycheck, (Def.'s 56.1 ¶ 112).[13]  Additionally, DOE restored her CAR balance.  (*Id.* ¶ 113.)  However, Plaintiff contends that as a result of not timely receiving her paychecks in September and October 2014, Plaintiff had to take additional credit through her bank, incurring increased interest payments.  (Pl.'s Counter 56.1 ¶ 112.)

The last day of classes for the 2013–14 school year was June 26, 2014.  (Def.'s 56.1 ¶ 99.)  Due to Plaintiff's absences from May 14 to the end of June 2014, Rodriguez was unable to perform Plaintiff's formal observation.  (*Id.* ¶ 100.)  Based on Plaintiff's scores from her three informal observations, Plaintiff received an overall APPR rating of "Developing" for the 2013–14 school year.  (*Id.* ¶ 101.)  Plaintiff believes this rating was invalid due to the insufficient number of informal reviews and the failure to evaluate Plaintiff during her informal reviews on all of the Danielson factors.  (Pl.'s 56.1 ¶ 101.)

### 3.  Plaintiff's Employment at Gateway School for Environmental Research and Technology, 2014–15

On May 15, 2014, the day after Plaintiff began her six-week leave of absence from BHSB, Plaintiff applied for a hardship transfer.  (Def.'s 56.1 ¶ 123.)  Plaintiff requested a hardship transfer for "Medical Reason" based on her January 6, 2014 LODI, a hardship transfer

---

¶¶ 111, 112.)  The payroll records Defendant cites to indicate that on September 15, 2014, and September 30, 2014, and October 15, 2014 Plaintiff received checks in amounts much lower than her typical paychecks.  (Branch Decl. Ex. KK ("Plaintiff Checking Statements").)  Plaintiff denies the fact that Plaintiff was paid her regular salary during that time period, but Plaintiff's 56.1 statement fails to cite the supporting portions of the record.  (Pl.'s Resp. 56.1 ¶ 111.)

[13] Plaintiff notes that Rodriguez responded angrily to Plaintiff's inquiry about her payroll and CAR deductions.  (Pl.'s Counter 56.1 ¶ 108.)

for "Assault/Other" based on an incident with a student who hit her arm in April 2013, and a "Travel Hardship" based on the distance from her home to BHSB. (*Id.* ¶ 124.)

The collective bargaining agreement ("CBA") between DOE and the union provides that DOE may grant teachers "hardship transfers" from their originally assigned school to a different school for renewable two-year periods. (*Id.* ¶ 118.) A teacher may receive a hardship transfer for multiple reasons, including as an accommodation for an existing medical condition. (*Id.* ¶ 119.) Under the CBA, if a teacher receives a hardship transfer, DOE reserves the right to return that teacher to his or her originally assigned school if the hardship abates within the first two years. (*Id.* ¶ 120.) Hardship transfers are not permanent assignments, and teachers in hardship assignments do not have the right to grieve program preference during the first two-year period. (*Id.* ¶ 121.) Teachers in hardship transfer status are encouraged to continue to apply for a regular program assignment that they prefer on DOE's Open Market, even while they are in a hardship transfer assignment. (*Id.*) Teachers who fail to make good faith efforts to secure a permanent position may be placed in Absent Teacher Reserve ("ATR") status at the end of the two-year period. (*Id.*)[14]

DOE denied Plaintiff's requests for a hardship transfer based on the April 2013 assault and travel hardship. (*Id.* ¶ 125.) However, DOE placed Plaintiff's medical hardship transfer request under review and requested from Plaintiff a list of three locations to which she would like to transfer. (*Id.* ¶ 126.) DOE approved Plaintiff's medical hardship transfer request on

---

[14] The ATR is the pool of DOE teachers who are not permanently assigned to one school. (Def.'s 56.1 ¶ 116.) Throughout the school year, ATR teachers are assigned to different locations in their district or borough, depending on need. (*Id.*) A teacher in the ATR may receive temporary weekly assignments, long-term assignments to cover other teachers on extended leave, or rotating assignments of various durations. (*Id.* ¶ 117.) Teachers assigned to the ATR are paid their salaries from central DOE funds, rather than the budget of a specific school. (*Id.*)

August 14, 2014.  (Branch Decl. Ex. QQ ("Hardship Transfer Medical Approval") 2 (Dkt. No. 42).)[15]  DOE notified Plaintiff by emails dated August 27 and August 29, 2014, as well as through a letter dated August 29, 2014, that she would be re-assigned as a hardship transfer to the Gateway School for Environmental Research and Technology ("Gateway"), located on DOE's Adlai E. Stevenson campus, from September 2, 2014 to June 30, 2015.  (Def.'s 56.1 ¶¶ 128, 130–31.)[16]  The Stevenson campus was one of Plaintiff's three preferred school campuses locations, and was much closer to Plaintiff's home than BHSB.  (*Id.* ¶ 129.)[17]  The notice of hardship transfer provided that, "to the greatest extent possible," she "must receive a regular program" in her "license area."  (Pl.'s Counter 56.1 ¶ 93; Branch Decl. Ex. NN ("Hardship Transfer Approval Letter").)  However, "if a regular program is not available," she

---

[15] The Parties disagree on what date the hardship transfer was approved.  (Def.'s 56.1 ¶ 126; Pl.'s Resp. ¶ 126.)  The record clearly indicates it was August 14, 2014.  (Hardship Transfer Medical Approval.)

[16] Rodriguez emailed DOE's Human Resources Division on September 3, 2014 stating that his school was "left with the difficult task of finding a replacement in a matter of [a] 24 hour[] time frame due to the vacancy that was created at the last minute based on the hardship transfer."  (Def.'s 56.1 ¶ 132.)  Rodriguez also noted in an email dated September 4, 2014 that Plaintiff was still listed as a teacher on his school's electronic system.  (*Id.* ¶ 133.)

[17] After receiving her hardship transfer to Gateway, Plaintiff received emails from DOE and union mailing lists for ATR teachers.  (*Id.* ¶ 134.)  Plaintiff notified DOE and her union in September and October 2014 that she received the emails, and properly informed them that she was an approved hardship transfer and not assigned to the ATR.  (*Id.* ¶ 135.)  DOE's Human Resources Division and TechSupport Departments advised Plaintiff that they were aware of her hardship transfer status, and that the emails had been sent to Plaintiff in error.  (*Id.* ¶ 136.)  Various individuals, including JoAnne Lupia, an employee in DOE's Human Resources Division, and Amy Arundell, the Director of Personnel and Special Projects for the UFT, Plaintiff's union, repeatedly confirmed Plaintiff's hardship transfer status with her throughout 2014 and 2015.  (*Id.* ¶ 137.)  Arundell further clarified to Plaintiff multiple times by email that, contrary to Plaintiff's beliefs, she had not been excessed from BHSB, and that Plaintiff was eligible to seek a permanent appointment at another school at any time.  (*Id.* ¶ 138.)  Plaintiff also asserted to others in emails that she knew that she was not assigned to ATR and had a hardship status.  (*Id.* ¶ 139.)

would "be assigned work appropriate to her license area and retain the right to apply for per session employment and compensatory time positions." (*Id.* ¶ 94.)

Once at Gateway, its principal, Lucille Dimeglio ("Dimeglio"), told Plaintiff there was no need for her at the school and moved her from classroom to classroom, "doing nothing." (*Id.* ¶ 95.) Dimeglio then recommended Plaintiff for a vacant position at Antonia Pantoja Preparatory Academy ("AP Prep") and introduced Plaintiff to the principal at AP Prep. (*Id.* ¶ 97.)

### 4. Plaintiff's Employment at The Antonia Pantoja Preparatory Academy, 2014–2015

In October of 2014, Plaintiff applied for and accepted the provisional assignment to AP Prep. (*Id.* ¶ 141 (citing Branch Decl. Ex. UU ("AP Prep Provisional Agreement") (Dkt. No. 42).)[18] AP Prep is located on the same Stevenson Campus as the Gateway School. (*Id.* ¶ 142.) The Provisional Assignment Agreement that Plaintiff signed explicitly stated that by accepting a provisional appointment, Plaintiff would only be assigned to the school as a regular staff member for one year. (*Id.* ¶ 143.) The Provisional Assignment Agreement did not state that Plaintiff was assigned to AP Prep as an ATR teacher. (*Id.* ¶ 144.) Plaintiff received an APPR rating of "Developing," for the 2014–15 school year at AP Prep. (*Id.* ¶ 145.)

Under the Advance system, all teachers rated "Developing" or "Ineffective" work with their principal to implement a Teacher Improvement Plan ("TIP"), which provides clear

---

[18] Plaintiff denies this fact in her response to Defendant's 56.1 statement, but does not cite to record evidence to support the denial. (Pl.'s Resp. 56.1 ¶ 141.) In her counter 56.1 statement, Plaintiff claims the principal at AP Prep informed Plaintiff the position was for a person on ATR status and there is an email indicating that she was on ATR status. (Pl.'s Counter 56.1 ¶¶ 97–98.) However, the agreement signed by Plaintiff indicates she accepted a "provisional assignment." (AP Prep Provisional Agreement.) And, an email from Arundell made clear Plaintiff was not in ATR and "the school cannot hire [her] as an ATR because there is no such thing." (Branch Decl Ex. TT.)

feedback, goals, and a timeline for professional growth in the following school year. (*Id.* ¶ 149.)

DOE's Advance Support Team advised Plaintiff by email, dated September 3, 2014, that she

would be scheduled for an Initial Planning Conference before September 17, 2014, during which

a TIP would be discussed. (*Id.* ¶ 150.) Plaintiff's supervisor at AP Prep, Pricilla M. Martinez,

issued Plaintiff a TIP on March 11, 2015. (*Id.* ¶ 151.) On May 11, 2015, Plaintiff emailed the

Principal of AP Prep, Nalini Singh, objecting to the TIP. (*Id.* ¶ 152.) On June 1, 2015, Plaintiff

formally filed an APPR Resolution Request concerning her TIP, and additionally requested that

the Union file a grievance. (*Id.* ¶ 153.) After Plaintiff received a "Developing" APPR rating for

the 2014–15 school year at AP Prep, she was again informed by email from DOE's Advance

Support Team that she should receive a TIP for the upcoming school year. (*Id.* ¶ 154.)

### 4.  Plaintiff's Employment at Harry S. Truman High School, 2015–2016

Following the conclusion of Plaintiff's one-year provisional assignment to AP Prep, DOE

issued Plaintiff a hardship transfer to Harry S. Truman High School ("HSTHS "), located in

Bronx, New York, for the 2015–16 school year. (*Id.* ¶ 146.) DOE's Human Resources Division

sent Plaintiff an email dated September 9, 2015, advising Plaintiff that she received the

assignment based on her "approved hardship accommodation." (*Id.* ¶ 147.) Plaintiff received

additional confirmation of her hardship transfer status following her assignment to HSTHS. (*Id.*

¶ 148.) Plaintiff contends that on her first day at HSTHS, that school's principal told her she was

in ATR and gave Plaintiff classes to cover, but not a regular assignment. (Pl.'s Counter 56.1

¶ 101.)

B.  Procedural History

Plaintiff filed the Complaint on April 22, 2015.  (Compl.)[19]  After receiving an extension of time, (Dkt. No. 11), on October 2, 2015, Defendant filed a pre-motion letter indicating the grounds on which it would move to dismiss the Complaint.  (Dkt. No. 12.)  On October 15, 2015, Plaintiff opposed the request.  (Dkt. No. 14.)  The Court held a pre-motion conference on November 24, 2015, and the Parties agreed to exchange certain documents relevant to a possible motion by Defendant.  (Dkt. (entry for Nov. 24, 2015).)  The Court held another status conference on January 5, 2016, where the Parties agreed to exchange certain other documents.  (Dkt. (entry for Jan. 5, 2016).)  On January 9, 2016, Plaintiff wrote a letter further opposing the proposed Motion To Dismiss.  (Dkt. No. 16.)  Defendant responded to Plaintiff's letter on January 14, 2015.  (Dkt. No. 18.)  The Court denied Defendant's request to file a Motion To Dismiss, because the documents Defendant was relying on were better directed at a potential summary judgment motion.  (Dkt. No. 19.)

Defendant filed an Answer on February 24, 2016.  (Answer (Dkt. No. 20).)  The case was referred to mediation, (Dkt. No. 21), but Plaintiff requested the matter be opted out, (*see* Dkt. No. 22), and the Court granted the request, (Dkt. No. 23).  The Court held a conference on January 27, 2017 and set a discovery schedule.  (Dkt. No. 26.)  On July 28, 2017, Defendant filed a pre-motion letter indicating the grounds on which it would move for summary judgment. (Dkt. No. 36).)  Plaintiff opposed Defendant's request on August 1, 2017.  (Dkt. No. 37.)  The Court held a pre-motion conference on September 6, 2017 and set a briefing schedule for the instant motion.  (Dkt. No. 40.)

---

[19] On August 19, 2015, Defendant requested the case be reassigned from White Plains to Manhattan.  (Dkt. No. 7.)  Plaintiff opposed the request.  (Dkt. No. 8.)  Because the case was properly filed in White Plains, the Court denied Defendant's application.  (Dkt. No. 9.)

Defendant filed the instant Motion for Summary Judgment and accompanying papers on October 27, 2017.  (Not. of Mot; Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 43); Def.'s 56.1; Branch Decl.)  Plaintiff filed her opposition and accompanying papers on November 27, 2017.  (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 48); Pl.'s 56.1; Sussman Decl.; Pl.'s Aff.; John Aff.)  After receiving an extension, on December 13, 2017, Defendant filed a reply.  (Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 51).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a Plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and internal quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (citations and internal quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage,

"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B. Analysis

Plaintiff claims that Defendant discriminated against her on the basis of national origin in violation of Title VII and discriminated against her on the basis of her disability in violation the ADA. (*See generally* Compl.) Defendant argues that a number of Plaintiff's claims are time barred and that Plaintiff failed to establish a prima facie case of national origin or disability discrimination. (*See generally* Def.'s Mem.)

1. Time-Barred Allegations

An aggrieved employee wishing to bring a Title VII or ADA claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1) (setting 180-deadline, unless the plaintiff institutes proceedings with a state agency first, which case the deadline is 300 days); 42 U.S.C. § 12117(a). It is undisputed that Plaintiff filed her national origin and disability discrimination claims with the

New York State Division of Human Rights, that was also filed with the EEOC, on December 16, 2014.  (Def.'s 56.1 ¶ 6.)  Thus, any claims for discrimination that accrued prior to February 19, 2014—300 days before December 16, 2014—are time-barred.

Here, Plaintiff's claims of discrimination relate to her performance reviews, denial of LODI status, and hardship transfer, all of which are "discrete" acts that accrued on the day that the events happened.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Thus, the December 19, 2012 Observation by Vieira falls outside the limitations period.  Plaintiff argues that the claims regarding the October 7, 2013 and December 12, 2013 Observations by Barba are timely, as he failed to provide her the written performance reviews from these observations until May 8, 2014.  (Pl.'s Mem. 9 n.4)  Defendant counters that Barba provided Plaintiff a copy of the October 7, 2013 observation on January 24, 2014, citing to an email from Barba that he had placed a copy in her mailbox.  (Pl.'s Resp. 56.1 ¶ 49.)  Assuming Plaintiff is disputing that she received the copies prior to May 8, 2014, the Court considers the performance reviews issued for these observations to have accrued after February 19, 2014 for the purposes of the instant Motion.

However, various statements Plaintiff relies on to support an inference of discrimination occurred outside the limitations period.  These include Vieira's alleged statements during 2012–13 school year while Plaintiff was employed JLHS that "she did not like Serbs" and that Plaintiff was a "crazy Serb;" Plaintiff's suggestion that Vieira was hostile to Plaintiff due to a lawsuit her husband filed; Plaintiff's allegation that Rodriguez asked Plaintiff if she purposely fell on January 6, 2014; and Plaintiff's claim that Barba was hostile to her during the post-observation conferences that occurred in October and December 2013.  While Plaintiff does not raise any timely discrimination claims based on these events specifically, they may still serve as

background evidence of Defendant's discriminatory motives in support of timely claims. *See*

*Orlando v. BNP Paribas N. Am., Inc.*, No. 14-CV-4102, 2015 WL 6387531, at *18 (S.D.N.Y.

Oct. 22, 2015) ("[A Plaintiff] may use the prior time-barred acts as background evidence in

support of a timely claim of workplace discrimination." (alterations and internal quotation marks

omitted); *Taylor v. New York City Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *5

(E.D.N.Y. Nov. 30, 2012) (explaining that an untimely discriminatory act "may constitute

relevant background evidence in a proceeding in which the status of a current practice is at issue"

(quoting *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977)).

## 2. Title VII Discrimination Claim

To establish a claim of national origin discrimination under Title VII, a Plaintiff must

meet the burden of proving that the adverse employment decision was motivated, at least in part,

by the "impermissible reason" of race or national origin. *See Fields v. N.Y. State Office of

Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). The claim

is analyzed under the familiar three-part burden-shifting framework set forth by the Supreme

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

> Under *McDonnell Douglas*, a [p]laintiff bears the initial burden of proving by a
> preponderance of the evidence a prima facie case of discrimination; it is then the
> defendant's burden to proffer a legitimate non-discriminatory reason for its actions;
> the final and ultimate burden is on the [p]laintiff to establish that the defendant's
> reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). To establish a prima facie

case of discrimination, Plaintiff must prove that: (1) she is a member of a protected class; (2) she

was performing her job duties satisfactorily; (3) she experienced an adverse employment action;

and (4) that such action occurred under circumstances giving rise to an inference of

discrimination. *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). Here, there is no dispute

that Plaintiff was a member of a protected class. However, Defendant argues that the undisputed evidence demonstrates that Plaintiff did not experience an adverse employment action and that such action did not occur under circumstances giving rise to an inference of discrimination.

Defendant first argues that Plaintiff has not suffered an adverse employment action. (Def.'s Mem. 8.) To constitute an adverse employment action in the context of a discrimination claim, there must be "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (emphasis and internal quotation marks omitted). This requires "a change in working conditions . . . more disruptive than a mere inconvenience or an alteration of job responsibilities," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotation marks omitted). The Court construes Plaintiff to raise the following allegedly adverse actions: (1) negative performance reviews in 2012–13 and 2013–14, (Pl.'s Mem. 1–2); (2) the delay in approving her LODI in July 2014, and the subsequent mix up with her paychecks and CAR account in September and October 2014, (*id.* at 2); and (3) the change in responsibilities at her hardship leave placements at Gateway in 2014–15 and HSTHS in 2015–16, (*id.*).[20] For the reasons that follow, the Court finds that, even construing the

---

[20] Plaintiff not only fails to provide any citations to support these claims, she also does not include a single record citation *in her entire opposition*. (*See generally* Pl.'s Mem.) This is not the first time Plaintiff's counsel has submitted such a brief to the Court, and the Court very well could disregard every single one of these unsupported assertions. *See Bucek v. Gallagher Bassett Servs., Inc.*, No. 16-CV-1344, 2018 WL 1609334, at *6 n. 11 (S.D.N.Y. Mar. 29, 2018); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 503 n.1 (S.D.N.Y. 2015) (disregarding all assertions in opposition papers that "do not contain citations to the record, or are not supported by the citations in the record").

evidence in the light most favorable to Plaintiff, none of these occurrences was an adverse action.

To begin, Plaintiff's negative performance evaluations on October 7, 2013, December 12, 2013, and April 4, 2014 were not adverse employment actions. "[N]egative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." *Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks omitted); *see also Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016) ("[C]riticism of an employee in the course of evaluating and correcting her work is not, in itself, a materially adverse employment action." (internal quotation marks omitted)); *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) ("[N]egative reports or evaluations . . . can be considered adverse employment actions when they give rise to material adverse changes in work conditions." (internal quotation marks omitted)); *Castro v. N.Y.C. Bd. of Educ. Personnel*, No. 96-CV-6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."). Here, Plaintiff has provided no record evidence of negative consequences that resulted from her performance reviews, such as an effect on promotions, salary, or the terms of her employment, and thus has failed to create a dispute of material fact as to whether she suffered an adverse employment action. *See also Chamberlin v. Principi*, No. 02-CV-8357, 2005 WL 1963942, at *5 (S.D.N.Y. Aug. 16, 2005) (finding that the plaintiff had not shown an adverse employment action where there was no evidence that "his career opportunities within or without [his place of employment] were damaged as a result of [a]

lowered [performance] evaluation"); *Knight v. City of New York*, 303 F. Supp. 2d 485, 497

(S.D.N.Y. 2004) (noting that disciplinary memoranda and evaluations are adverse employment

actions only if they affect terms of employment such as promotions, wages, or terms).[21]  Even if

Plaintiff found the post-observation conference unnecessarily harsh and critical of her teaching,

"[i]t hardly needs saying that a criticism of an employee (which is part of training and necessary

to allow employees to develop, improve and avoid discipline) is not an adverse employment

action."  *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 619 (S.D.N.Y. 2009)

(internal quotation marks omitted); *see also Young v. Pitney Bowes, Inc.*, No. 03-CV-1161, 2006

WL 726685, at *27 (D. Conn. Mar. 21, 2006) ("[C]riticism of an employee [alone] is not an

adverse employment action." (alteration and internal quotation marks omitted));

*Dimitracopoulos v. City of N.Y.*, 26 F. Supp. 3d 200, 214 (E.D.N.Y. 2014) ("A thin-skinned

worker's reaction to criticism by a supervisor will not support a claim of . . . discrimination

unless it is outside the bounds of appropriate supervision.").[22]

---

[21] Plaintiff's brief states that "Rodriguez sought to excess [P]laintiff, causing a material change in her employment status."  (Pl.'s Mem. 10.)  There is no citation to the record to support this claim.  Indeed, it is undisputed from the record evidence that Plaintiff *was not* excessed. (Pl.'s Resp. 56.1 ¶ 138 (admitting Defendant's fact that "Arundell further advised [P]laintiff multiple times by email that, contrary to [P]laintiff's beliefs, she had not been excessed from BHSB") (citing Branch Decl. Ex. TT).)  Plaintiff's brief also states, without citations to the record, that "she plainly experienced such changes [to salary, benefits, or other conditions of employment] when assigned to Gateway and then to [AP Prep] within the limitations period." (Pl.'s Mem. 2 n.2.)  The Court's own review of the record concludes Plaintiff most likely is referring to the salary deduction that resulted form the mix up with the LODI status.  That claim is addressed below.  Finally, Plaintiff either was, or should have been, placed on a TIP as a result of receiving a "Developing" rating in the 2013–14 and 2014–15 school years.  (Def.'s 56.1 ¶¶ 149–54.)  However, the email Plaintiff received regarding the TIP made clear: "The TIP should in no way be construed as disciplinary in nature and should be seen by all parties involved as a way to improve educator effectiveness through professional development. " (Branch Decl. Ex. XX ("Advance TIP Emails").)  Plaintiff does not argue otherwise.

[22] Plaintiff's brief states, without record citations, that failing to evaluate Plaintiff in all of the Danielson components was an adverse action.  (Pl.'s Mem. 10–11.)  However, the observers

To the extent Plaintiff is arguing that the failure to timely approve her LODI in June 2014 was an adverse employment action, that claim fails. Plaintiff's LODI was eventually improved, and even if Plaintiff is correct that her paperwork was correctly filed the first time and the delay was at no fault of her own, "courts in the Second Circuit have repeatedly held that delay in the processing of workers' compensation papers . . . is not an adverse employment action." *Alexidor v. Donahoe*, No. 11-CV-9113, 2017 WL 880879, at *6 (S.D.N.Y. Mar. 2, 2017) (collecting cases); *see also Carter v. Potter*, No. 06-CV-3854, 2008 WL 1848639, at *4 (E.D.N.Y. Apr. 23, 2008) ("[A] delay of only several months . . . do[es] not rise to the level of [an] adverse employment action[ ]."). That the subsequent misunderstanding from the delay in processing Plaintiff's LODI caused Plaintiff a temporary deduction in salary and depletion of her CAR account is of no consequence. Plaintiff was fully reimbursed for any salary owed and her CAR account balance was also restored. (Def.'s 56.1 ¶¶ 112–13.) "Both incidents were mere

---

were not required to evaluate Plaintiff in all the criteria. (*See* Evaluation Form (stating "if there is no evidence for a component, N/A (Not Applicable) should be entered").) Additionally, as part of BHSB's status as a Restart School, observations were supposed to focus on only seven specific Danielson competencies. (Def.'s 56.1 ¶ 43 (quoting BHSD 2013–14 Faculty Handbook 24).) These seven are the ones on which Plaintiff was evaluated. (Oct. 7, 2014 Observation; Dec. 12, 2013 Observation; Apr. 7, 2014 Observation.)

Plaintiff's brief alleges, without record citations, that Barba failed to provide her unspecified teaching "support," and this was an adverse action. (Pl.'s Mem. 11.) This claim also fails to survive summary judgment. While denial of support resources, such as training, can constitute an adverse employment action where it "bear[s] on either [the] plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation," *Nakis v. Potter*, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec.15, 2004), "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action," *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (rejecting claim that inadequate training constituted an adverse employment action). The only negative consequences suggested from Barba's lack of support were Plaintiff's negative performance reviews, as she seems to argue the lack of support led to the negative reviews. (Pl.'s Resp. 56.1 ¶ 81.) However, as discussed above, Plaintiff was not penalized in pay, rank, or responsibility for her adverse employment reviews; thus her claim of lack "support" similarly fails.

inconveniences, which simply do not constitute adverse employment actions." *Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *12 (S.D.N.Y. Mar. 26, 2009) (internal quotation marks omitted) (delay in processing of travel voucher was mere inconvenience), *aff'd*, 376 F. App'x 127 (2d Cir. 2010); *see also Alexidor*, 2017 WL 880879, at *6 (holding "delay in the processing of . . . paychecks is not an adverse employment action"); *Miller v. N.Y.C. Health & Hosp. Corp.*, No. 00-CV-140, 2005 WL 2022016, at *6 (S.D.N.Y. Aug. 22, 2005) ("The plaintiff has failed to set forth any evidence that indicates the delayed payment . . . was anything more than a mere inconvenience."), *aff'd*, 198 F. App'x 87 (2d Cir. 2006); *Lee v. New York State Dep't of Health*, Nos. 98-CV-5712 & 99-CV-4859, 2001 WL 34031217, at *17 (S.D.N.Y. Apr. 23, 2001) (holding that delay in receipt of overtime payment was not an adverse employment action); *Badrinauth v. Touro Coll.*, No. 97-CV-3554, 1999 WL 1288956, at *6 (E.D.N.Y. Nov. 4, 1999) ("A delay in the receipt of a paycheck is not an adverse employment action."). *But see Miller*, 2005 WL 2022016, at *6 ("A four-year span may constitute more than inconvenience."). The record indicates that Defendant's employees worked with Plaintiff and her union to resolve the incident at issue. (Pl.'s Counter 56.1 ¶ 85.) Indeed, Plaintiff was reimbursed for the lost wages and her CAR account balance was restored. (Def.'s 56.1 ¶¶ 112–13). *Gelin*, 2009 WL 804144, at *12 (noting the fact that the plaintiff was reimbursed for travel with assistance of supervisor demonstrated no adverse action occurred).

Moreover, the record evidence is overwhelming that any delay in approving the June 4, 2014 LODI application, and the subsequent mistakes that occurred as a result with her paychecks and CAR account, was a result of Plaintiff's delay in submitting all of the required documentation with her application. (LODI Denial Letters.) Letters from DOE on July 11 and August 6, 2014 indicate that in her application, Plaintiff had not submitted: form OP 198 with a

principal's signature, an employee written statement, or a completed comprehensive injury report. (*Id.*)[23] A subsequent letter on October 21, 2014 indicated DOE *still* did not have all of the required medical documentation, further suggesting that at least some of the delay resulted from Plaintiff's own conduct. (Def.'s 56.1 ¶ 107.) *See Alexidor*, 2017 WL 880879, at *6 (noting the fact that the plaintiff's own conduct caused some of the delay in processing benefits hindered the claim for adverse employment action); *Miller*, 2005 WL 2022016, at *6 ("When an employee's own errors contribute to delayed payment, the employee cannot reasonably assert that he or she endured an adverse employment action."); *Badrinauth*, 1999 WL 1288956, at *6 (noting that the plaintiff failed to turn in his time sheets and attendance forms and acknowledged that this would result in a delay of processing). "Particularly given that the evidence in the record—including evidence submitted by Plaintiff—suggests that [the incident] arose because of Plaintiff's own mistakes, the Court cannot conclude that [the] incident[] constitute[s] an adverse employment action." *Gelin*, 2009 WL 804144, at *12.

The lack of full-time teaching positions at her hardship leave placements also does not constitute an adverse action. A change in job responsibilities is not necessarily an adverse employment action. *See Galabya*, 202 F.3d at 640. Neither is underutilization of a Plaintiff's skills. *See Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001). Under certain circumstances, the receipt of undesirable assignments may rise to the level of an adverse employment action. *See, e.g.*, *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004) (concluding that the plaintiff's receipt of a "disproportionately heavy workload" constituted a

---

[23] Plaintiff counters that she submitted all of the necessary documentation in her January 2014 application for LODI. (Pl.'s Counter 56.1 ¶ 106.) However, there is no record evidence to suggest Plaintiff was not required to resubmit all proper documentation for each new LODI application filed. And, requiring Plaintiff to resubmit the documentation was at best a minor inconvenience, not an adverse action.

materially adverse employment action). However, "[t]o be an adverse employment action, these actions must be accompanied by materially adverse changes in employment, such as a demotion or a loss of wages." *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). In this case, Plaintiff alleges that when she got to Gateway there was no need for her at the school and she was moved from classroom to classroom, "doing nothing." (Pl.'s Counter ¶ 95.) Plaintiff also alleges that on her first day at HSTHS, that school's principal told her she was in ATR and gave Plaintiff classes to cover, but not a regular assignment. (Pl.'s Counter 56.1 ¶ 101.) While these circumstances arguably underutilized Plaintiff's skills, there is no record evidence that such assignments were a "materially adverse change in the terms and conditions of [her] employment." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014) (internal quotation marks omitted). Indeed, courts routinely find claims that a plaintiff was given tasks and assignments not on par with their professional experience and that a plaintiff was generally dissatisfied with assignments insufficient to make out an adverse action. *See Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *5 (S.D.N.Y. Aug. 11, 2016) (dismissing Title VII discrimination claim because the fact that the plaintiff was "given tasks and assignments that were not commensurate with his status as a long-term DOT employee," including being assigned "menial tasks normally given to lower-grade employees," amounted to mere inconvenience (alterations and internal quotation marks omitted)); *Johnson v. Morrison & Foerster LLP*, No. 14-CV-428, 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015) (dismissing Title VII discrimination claim because the "[p]laintiff's dissatisfaction with the work assigned (or not assigned) to him by his supervisors is insufficient to make out an adverse employment action"); *Grant v. N.Y. State Office for People with Developmental Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013) (dismissing Title VII discrimination

claim because the plaintiff's "assignment to more onerous work assignments" did not constitute an adverse employment action); *Hill*, 467 F. Supp. 2d at 352 (finding that a "change in job responsibilities" and "underutilization of [the] [p]laintiff's skills" were not adverse employment actions in the absence of "materially adverse changes in employment, such as a demotion or a loss of wages"); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[R]eceiving unfavorable schedules or work assignments do not rise to the level of adverse employment actions because they do not have a material impact on the terms and conditions of [the] [p]laintiff's employment." (alterations and internal quotation marks omitted)).[24]  Plaintiff has not alleged, let alone provided any evidence of, how her terms of conditions of employment changed.  There is no allegation or evidence that her salary, benefits, promotion potential, or any other material measure of her employment status changed.  Thus, Plaintiff's dissatisfaction with her assignments at Gateway and HSTHS was not an adverse employment action.

For the same reasons, Plaintiff's choice to leave Gateway for a position at AP Prep was not an adverse employment action.  Even assuming Plaintiff was placed on ATR status as a result of accepting the position at AP Prep, Plaintiff does not explain how ATR status serves as a demotion or loss of wages.  *See Pimentel v. City of New York*, No. 00-CV-324, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (requiring something more than an undesirable assignment to prove adverse action), *aff'd*, 74 F. App'x 146 (2d Cir. 2003).  More problematic is that Plaintiff's suggestion that she was even placed ATR status is belied by the record.  (Pl.'s

---

[24] Plaintiff suggests that DOE somehow violated its own policy by assigning her to a school unable to staff her at a "regular program."  (*See* Hardship Transfer Approval Letter.) However, the policy itself lends no support for this assertion.  (Hardship Transfer Approval Letter.)  The Letter Plaintiff received states that "to the greatest extent possible," Plaintiff was to receive a regular program in a license area.  (*Id.*)  But, the letter also accounts for what happens "when a regular program is not available," indicating it was not mandatory she receive her regular assignment upon transfer.  (*Id.*)

Counter 56.1 ¶¶ 97–98.)  Plaintiff herself admits the Provision Assignment Agreement she signed with AP Prep did not say she was an ATR teacher.  (Def.'s 56.1 ¶ 143; Pl.'s Resp. 56.1 ¶ 143.)  And emails between Plaintiff and Arundell indicate that AP Prep could not have even hired Plaintiff for the school year as an ATR, rather, she could only be hired to fill a vacancy. (Branch Decl Ex. TT, at 6 (email from Arundell to Plaintiff stating: "The school cannot hire you as an ATR because there is no such thing.").)  Further, Plaintiff admits that the ATR emails were being erroneously sent to her and that she informed DOE and the Union of this fact multiple times in September and October 2014.  (*Id.* at 5 (email from Arundell to Plaintiff stating: "As per our conversation, I want to be 100% clear here. YOU ARE NOT AN ATR.").)

Nor can Plaintiff succeed on the argument that her transfer—which, *she* requested—was an adverse employment action.  Plaintiff requested a hardship transfer to the Stevenson campus, as she wanted a school with parking closer to the school entrance and a shorter drive to work. (Pl.'s Counter 56.1 ¶ 90.)  Her request was granted.  (Def.'s 56.1 ¶ 128.)  Moreover, Plaintiff has not established that her requested transfer adversely affected her in an actionable way.  "A transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively."  *Watson v. Paulson*, 578 F. Supp. 2d 554, 563 (S.D.N.Y. 2008); *see also Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) ("[P]laintiff must show that the transfer created a materially significant disadvantage." (internal quotation marks omitted)); *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion." (internal quotation marks omitted)).  For example, "if an employee earns the same salary, has the same benefits, works the same hours and

has the same opportunities for promotion following a transfer then there is no adverse employment action." *Watson*, 578 F. Supp. 2d at 564 (internal quotation marks and alterations omitted). Here, there is no evidence that Plaintiff's transfer constituted a "significant change in the nature of [Plaintiff's] work," *Boyd*, 160 F. Supp. 2d at 536, as the evidence suggests that the transfer was "truly lateral," *Watson*, 578 F. Supp. 2d at 563—she switched schools, but maintained the same job position, promotion potential, and salary, just at a different school in the district. Moreover, Plaintiff has presented nothing to suggest that her benefits, hours, or opportunities for promotion were remotely affected by the transfer. As such, Plaintiff has not shown that this transfer—which again she requested—constituted an adverse employment action. *See Pacheco*, 593 F. Supp. 2d at 618 (stating standard and holding that the plaintiff had not raised a triable issue of fact as to whether he had suffered an adverse employment action where his transfer "resulted in no change in pay, benefits, or bargaining unit seniority" and "nothing in the record . . . support[ed] the notion that the promotion path in [his previous position] was somehow better . . . or that [he] lost out on any specific job opportunity"); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 298 (S.D.N.Y. 2009) (finding transfer was not adverse action where the plaintiff has produced no evidence that her move from the high school to the middle school resulted in any decrease in salary, benefits, or opportunity for job advancement.)

Because the record contains absolutely no evidence Plaintiff suffered an adverse employment action, the Court need not determine whether Plaintiff has raised an inferences of discrimination, or proceed to the other steps of the burden shifting framework. Accordingly, the Court grants Defendant's summary judgment motion for the Title VII national origin based discrimination claims.

<u>3. ADA Claims</u>

Plaintiff claims that Defendant violated the ADA by failing to approve her LODI and failing to provide a reasonable accommodation by not assigning her to a "regular program" while on hardship transfer at Gateway. (*See generally* Compl.) Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish a prima facie case of disability discrimination and, even if she can, she cannot show that Defendant's proffered non-discriminatory reasons for its actions were a pretext for disability discrimination. This claim is also analyzed under the *McDonnell* burden-shifting framework. *See Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015). Because the Court already addressed the denial of Plaintiff's LODI application and concluded it was not an adverse action, the Court is left to address the reasonable accommodation claim.

The ADA "require[s] an employer to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure-to-accommodate claim, a plaintiff must show that: "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [the plaintiff] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Id.* (internal quotation marks omitted). The Parties do not dispute that Plaintiff has made a sufficient showing that she was disabled and that Defendant had notice of the disability at the time of her hardship transfer. Thus, the Court must determine whether

Plaintiff made a sufficient showing that Defendant refused to provide her with a reasonable accommodation.

Although it is true that the "reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder, . . . in a case . . . in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Id.* (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)). An accommodation is reasonable if it "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). "Reasonable accommodation may take many forms, but it must be effective." *Noll*, 787 F.3d at 95. The Court finds no dispute that Defendant provided reasonable accommodations here.

The uncontested facts show that Defendant attempted to accommodate Plaintiff's disabilities by granting her hardship transfer request. Plaintiff applied for a hardship transfer in May 2014, specifically noting she wanted a school closer to her house and with parking to reduce the amount of walking she had to do. (Def.'s 56.1 ¶ 123; Branch Decl. Ex. MM.) Defendant asked Plaintiff to provide three locations where she would like to be transferred to. (Def.'s 56.1 ¶ 126.) At Plaintiff's request, Defendant transferred her to schools on the Stephenson Campus—Gateway and HSTHS. (Branch Decl. Ex PP.) Defendant's policy provided that individuals granted a hardship transfer would receive placement in a "regular program . . . to the greatest extent possible." (Hardship Transfer Approval Letter.) However, "if a regular program is not available," the teacher "would be assigned work appropriate to her

license area." (*Id.*) DOE regulations did not require Defendant to create a position where one did not exist or create classes that needed teachers as part of her hardship transfer. (Branch Decl. Ex. PP ("[A]s indicated, you are not assigned to a vacancy, you are assigned to a school that meets the criteria of the medical determination.") *See Sharbono v. N. States Power Co.*, 218 F. Supp. 3d 1004, 1016 (D. Minn. 2016) (rejecting claim that "an employer must accommodate an employee by transferring him to a position with comparable pay and benefits," because "by this logic an employer would be obligated to create a new position for an employee when no other accommodation was possible," and "[t]hat is clearly not the law"), *aff'd*, --- F.3d ---, 2018 WL 4224427 (8th Cir. Sept. 6, 2018). Accordingly, even though there was not a full-time opening, Plaintiff was transferred to her desired location and assigned to teach Special Education, her area of license. Thus, at her hardship transfer placements, Plaintiff was able "to enjoy equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(iii). "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95 (citing 29 C.F.R. § 1630 app. ("[Although] the preference of the individual with a disability should be given primary consideration[,] . . . the employer providing the accommodation has the *ultimate discretion* to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.")). Here, Plaintiff was provided her preferred location. That the assignment there was not "perfect" does not mean the accommodation was not reasonable or effective.

Additionally, Plaintiff's move from Gateway to AP Prep was based on a choice she made, and upon receiving transfer, she was able to work at AP Prep on a one-year provision assignment as a regular member of the staff as a Special Education Teacher. (AP Prep

41

Provisional Agreement.) This transfer—to a full-time opening in her field at a school on the campus of her choice—was the exact accommodation she sought, and ultimately received. The Court has already rejected Plaintiff's unsupported claims that the position at AP Prep was a demotion or resulted in her being on ATR status. The Court thus grants summary judgment to Defendant on Plaintiff's claim for disability discrimination based on Defendant's failure to provide a reasonable accommodation.[25]

### III. Conclusion

In light of the foregoing, the Court grants Defendant's Motion for Summary Judgment in its entirety. The Clerk of Court is respectfully directed to terminate the pending motion, enter judgement for Defendant, and close the case. (Dkt. No. 41.)

SO ORDERED.

DATED:    September 28, 2018
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[25] To the extent Plaintiff argues that Rodriguez denied her a reasonable accommodation by asking Plaintiff when she would return to work and informing Plaintiff that her absences were preventing her required observations from occurring in May of 2014, (Def.'s 56.1 ¶ 84–89), the record is undisputed that Plaintiff did not file her LODI application until June 4, 2014 and that Rodriguez was unaware that a disability was causing Plaintiff's absences even after the application was filed, (*see, e.g.*, Branch Decl. Ex. BB (email from Rodriguez on June 3, 2014 saying Plaintiff had called out sick because she did not "feel well"—not because of a disability)). Thus, Plaintiff has not demonstrated "an employer covered by the statute had notice of [her] disability," at the time of the alleged conduct, and cannot make out a prima facia case for this claim. *Noll*, 787 F.3d at 94.